IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | |
| ROBERT N. ALLEN, SR. and | Chapter 7 |
| LORAINE L. ALLEN, | |
|     Debtors | |
| | Case No.: 1-04-05995 |
| ROBERT N. ALLEN, | |
|     Plaintiff | |
| v. | |
| AMERICAN EDUCATION SERVICES, | |
|     Defendant | |

## OPINION

Before the Court is the adversary complaint of Robert N. Allen ("Robert") seeking a determination that his student loans are dischargeable under 11 U.S.C. §523(a)(8) because repayment of the loans would cause him "undue hardship." Defendant, American Education Services ("AES"), is an unincorporated division of the Pennsylvania Higher Education Assistance Agency ("PHEAA"). PHEAA guaranteed certain student loans Robert obtained in 1996 to finance his education at the Bradley Academy for the Visual Arts ("Bradley") in York, Pennsylvania. Robert and his wife, Loraine Allen ("Loraine") ( collectively "Debtors") filed a petition under Chapter 7 on February 20, 2004. A trial was held on the instant complaint on January 20, 2005. Briefs have been filed, and the matter is ready for decision.[1]

## Factual Findings

Robert and Loraine are 64 and 60 years of age, respectively. They have four grown sons none of whom reside with them. Both Debtors have high blood pressure and diabetes, but Robert

---

[1] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A),(I) and (O). This Opinion constitutes the findings of fact and conclusions of law made under Fed. R. Bankr. P. 7052.

does not have any health problems that would impair him from working in his profession. Robert is a technical illustration instructor for Computer Sciences Corporation ("CSC"), and Loraine is not gainfully employed.

When Debtors filed their schedules, they reported income of $1,771.59 per month – $1,264.00 per month from Social Security and $507.59 from a pension. Their expenses were listed at $1850.00 per month. Thereafter, Robert obtained employment with CSC earning a monthly net income of $2,272.00. His current income is derived from his compensation from CSC and his pension in a total amount of $2,780.00 per month. Debtor filed revised schedules showing increased expenses of $2,768.83, thus leaving Debtors only a negligible amount of disposable income. Once Robert started working for CSC, he no longer was eligible to receive Social Security benefits. When he attains 65 years of age he again will be able to draw benefits, and Loraine will become eligible for Social Security payments at age 62. The amount of income that Debtors will receive when they are both eligible was not made a part of the record. Debtors income rose slightly between 2000 and 2003, except in 2001when Robert was unemployed. In 2003, his gross income was $27,171.00. Debtors' current income is typical of their average monthly income for 2000, 2002, and 2003.

Debtors' schedule of expenses generally are modest. When they filed their petition they were paying $764.00 per month for rent. Shortly before the trial, Debtors moved to another apartment because of chronic problems with noise and disturbances created by other tenants of the complex. They currently are paying rent of $875 per month. They expend $200 per month on utilities and $300 per month on food. Debtors own two motor vehicles, a 2002 Honda Civic and a 1994 Dodge Intrepid. Payments on the Honda loan are $326.57 per month, and the Dodge is

2

Case 1:04-ap-00085-MDF    Doc 21    Filed 05/05/05    Entered 05/06/05 10:41:17    Desc
Main Document    Page 2 of 13

unencumbered. The loan on the Honda is scheduled to be paid off in 2007. Debtors' current budget does not include any allowances for clothing or recreation. Their medical expenses, which include only medications, approximate $598.00 per month. No amount has been budgeted for medical treatment, although the Debtors have no health insurance. Robert testified that Loraine suffers from a heart condition,[2] as well as arthritis and diabetes. Robert has diabetes and high blood pressure. When Robert was unemployed, Debtors were eligible for a government-sponsored program that partially paid for their medications. Once Robert obtained employment at his current salary, Debtors no longer were eligible for the program. Robert believes that he will be eligible for drug coverage under Medicare when he reaches age 65.

When Robert was approximately 55 years of age he decided to pursue further education in computer-generated graphic arts because of general trends in the field toward computerization. To assist in financing his education, Robert applied for and received two Stafford loan through Citizens Bank. The student loans were serviced by the Student Loan Servicing Center, a division of AES, and were guaranteed by PHEAA. The first loan, in an amount of $6,625.00, was disbursed in 1996 and had an unpaid balance as of May 28, 2004 of $9,302.57. The second loan, in an amount of $2,667.00, was disbursed in 1997, and had an unpaid balance as of May 28, 2004 of $3752.27.

Robert has an extensive, continuous work history in the field of technical illustration. Between 1976 and 1986 he worked for various Westinghouse affiliates as a trainer, supervisor of technical illustrators, and art coordinator. From 1986 to 1994 he worked at Environmental Technologies Group, Inc. as a senior technical illustrator until he was laid off. From 1994 to

---

[2]The exact nature of this condition is not of record. No medical records were submitted into evidence. Robert's testimony was not specific as to the nature of the ailment.

3

1996 he was an independent[3] consultant for Science and Technology Corporation. In 1996 he started a small business called Allen Graphics, of which he was the sole proprietor and employee. Through Allen Graphics he solicited contract work in technical illustration on a full time basis until 2001. Between 2000 and 2004 he did contract work for CSC, but was unemployed for various periods, including most of 2001. When he was unable to use his skills as a technical illustrator, Robert supplemented his income with part time jobs at various retail establishments. Although he currently is able to use his professional skills, Robert's continued employment at CSC is entirely dependent on whether CSC renews certain contracts with the federal government each year.

Loraine has never been employed outside the home. However, she currently provides day care services each day to five of the couple's grandchildren. None of the children in Loraine's care are Debtors' dependents. Inexplicably, Debtors' sons do not compensate their mother for the services she provides, but do defray the cost of providing meals and snacks for the children.

Although he successfully completed the recommended program at Bradley, Robert's degree did not assist him in obtaining employment. He stated that he was "guaranteed" by persons associated with Bradley that he easily would find employment, but the positions went to younger workers. He attributes his failure to obtain any job offers to his age. Robert actively sought employment after he completed his training at Bradley. He estimates that between 2002 and 2004 he had approximately eight employment interviews, none of which resulted in a job offer.

---

[3] He testified that he was hired as a "freelance" artist but was paid through the company's payroll.

4

Robert's education loans became payable on November 3, 1997. He made eight payments beginning December 1997 for a total amount paid of $1,587.47. Thereafter, PHEAA granted him forbearances and deferments totaling approximately 62 months. As of January 20, 2005, the total balance owed on the loans was $13,406.92. Robert's monthly payment is currently set at $195.00 per month.

## DISCUSSION

The Bankruptcy Code excepts from discharge any debt insured or guaranteed by a governmental unit as an educational benefit unless the debtor can show that repayment of the debt will impose an undue hardship on the debtor and the debtor's dependents. 11 U.S.C. §523(a)(8). The Code does not define the term "undue hardship," so a Court must review the facts of each case to determine whether the circumstances justify discharge of the debt. *In re Boston,* 119 B.R. 162, 164 (Bankr. W.D. Ark. 1990). In *In re Faish*, 72 F.3d 298 (3d Cir 1995), the Third Circuit adopted the Second Circuit's three-pronged test set forth in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2nd Cir 1987). Under this test "undue hardship" is dependent upon three factors:

> (1) [whether] the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans;
>
> (2) [whether] additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for student loans; and
>
> (3) [whether] the debtor has made good faith efforts to repay the loans.

*Faish,* 72 F.3d at 304-05 (quoting *In re Brunner*, 831 F.2d 395, 396 (2nd Cir. 1987)).

A debtor must prove all three elements of the test set out in *Faish* by a preponderance of the evidence in order to prevail in an action under Section 523(a)(8). *Faish,* 72 F.3d at 306. If any of

5

the three prongs are not met, the student loan cannot be discharged. *Id.* "Moreover, this test must be strictly construed: equitable concerns or other extraneous factors not contemplated by the test may not be imported into the analysis of 'undue hardship.'" *In re Brightful*, 267 F.3d 324, 328 (3d Cir. 2001)(citation omitted).

In *Faish*, the debtor, a single mother earning $27,000 a year, incurred a student loan of approximately $32,000.00. She lived in a rented home in a low-income neighborhood, suffered from Crohn's disease and other ailments, and did not own a car. The Third Circuit observed that notwithstanding her personal difficulties and health challenges, with some lifestyle modifications Faish would be able to repay her student loan. Similarly, in *Brightful*, the school loans of the debtor, a single mother with emotional problems who lived with her sister because she could not afford housing and earned $8500 the year in which she filed for bankruptcy, were not discharged because debtor could not prove "a total incapacity . . . in the future to pay [her] debts for reasons not within [her] control." *Id.* (citing *In re Faish*, 72 F.3d at 307 (quoting *In re Brunner*, 46 B.R. 752, 758 (S.D.N.Y. 1985)). With the guidance provided by the Third Circuit in mind, I will apply each of the prongs of the *Brunner-Faish* test to the facts in the within case.

    a.    *Can debtor maintain a minimal standard of living?*

Under the first prong of the test, Robert must establish that he will not be able to "maintain, based on current income and expenses, a 'minimal' standard of living" if required to repay the loans. *Faish*, 72 F.3d at 306. Debtor and his wife have a monthly income of $2,780.00 and report monthly expenses of $2,768.83. Debtors' current monthly income was slightly higher on the trial date than it had been when the case was filed. Robert is employed full time as a technical illustrator, the profession for which he is trained, and his wife is unemployed. PHEAA introduced evidence that

Robert could obtain a better paying job in his profession, but I do not find the evidence offered by PHEAA to be persuasive. PHEAA introduced a list of 110 jobs available in the Commonwealth of Pennsylvania that were represented as being in an occupational category for which Robert had been trained. Most of the positions did not list a specific salary, so it was impossible to know whether Debtors' financial position would improve even if Robert were to be offered a position. Although the Court did not attempt to review all of the potential jobs submitted, several were clearly inappropriate when Robert's skills were compared to the requirements of the advertised position.[4] Robert's testimony about his futile efforts to acquire a higher paying position after he obtained his degree from Bradley was more persuasive. Therefore, the Court believes that Robert currently is maximizing his income in a vocation for which he is trained, and there is no evidence that he could obtain higher pay in a different position.[5]

Loraine cares for five of her grandchildren during the day, but earns no income. She has no work history outside of the home, and she reportedly suffers from several maladies that restrict her

---

[4]As an example, one position was for a "web master," which required diverse computer programing skills that Robert does not have. Another position was as a concession operator at the Pocono Raceway, which would not use Robert's technical illustration skills. Yet another position was for disk jockey on a rock radio station. Clearly, no effort was made to match Robert's skills to the requirements of the positions that were presented as being available.

[5]The Court also must consider that Loraine is providing valuable services to her adult children, but is receiving no compensation for those services. This Court cannot compel Debtors' children to pay her for her services, but it can consider that she is providing these services to her children gratuitously, rather than seeking work for which she would be compensated. *See In re Holmes*, 205 B.R. 336, 340 (Bankr. M.D. Fla. 1997)(court must consider "whether the debtor has made a good faith effort to maximize income and minimize expenses.") *In re Johnson,* 5 BCD 532, 537-38 (Bankr. E.D. Pa. 1979). And while the student loans are Robert's, I find it appropriate to analyze the possible "hardship" repaying the loans will impose upon the Debtors by considering Loraine's expenses and income. *In re Fish*, 302 B.R. 503(Bankr. W.D. Pa. 2003).

employability.[6] Considering her age, physical limitations, and work history, it would be difficult for Loraine to obtain employment outside the home. Further, since PHEAA did not argue that she could contribute to the household's income, I have no difficulty finding that Debtors' income reflects their best efforts at the present time.

The analysis under the first *Brunner-Faish* prong does not turn on income alone, however. The Court also must examine Debtors' expenses. A minimal standard of living generally includes the basic necessities, such as food, clothing, housing and medical treatment, but excludes luxuries. *See In re Nary,* 253 B.R. 752, 763 (N.D. Tex 2000); *In re Ritchie*, 254 B.R. 913, 918 (Bankr. D. Idaho 2000). More than half of Debtors' monthly income is spent on rent ($875)[7] and prescriptions ($588). Debtors' vehicle expenses are reasonable considering the travel distance to Robert's employer in Maryland. Debtors arguably could forgo cable service, but eliminating this item would only increase available income by approximately $44.00 per month. Debtors also maintain life insurance at a cost of $100 per month. Although this expense may be considered a "luxury" in other circumstances, this expense is justified considering the Debtors' ages and Loraine's poor prospects for employment. Other circumstances that must be considered are the inevitable expenses which will accrue that were not addressed by Debtors in their budget. Debtors have no health insurance, and nothing has been budgeted for medical expenses other than prescriptions. This omission from

---

[6] The Court does express some incredulity about the severity of Loraine's health problems considering she is able to care for five young children on a regular basis.

[7] Between the filing of the petition and trial of the Complaint, Debtors moved from an apartment with a monthly rent of $764 to an apartment with a monthly rent of $875. PHEAA appropriately challenged this voluntary increase in expenses, but Robert testified that Debtors moved because of concerns about the security and habitability of the apartment they were renting at the filing date. Robert's testimony was credible, and I find that this increase in the Debtors' housing expense was justified.

8

Debtors' budget is patently unrealistic since Robert testified about Loraine's chronic health problems, and Debtors' schedules listed approximately $1500 in medical expenses as unsecured claims. There also was no provision in the revised budget for clothing. Based upon these facts, I find that Robert would not be able to maintain a minimal standard of living if forced to repay his student loans. Thus, he has provided adequate evidence to meet the first prong of the *Brunner-Faish* test.

  b.  *Is Debtors' inability to pay likely to persist?*

Under the second prong of the test, Debtors must prove that they will be unable to repay Robert's student loans and maintain a minimal standard of living for a significant portion of the loan repayment period. As noted by the Third Circuit in *Brightful*, this is a demanding test. *Brightful*, 267 F.3d at 328. "[I]t is not enough for [Debtors] to demonstrate that [they are] currently in financial straits; rather, [they] must prove 'a total incapacity . . . in the future to pay [their] debts for reasons not within [their] control." *Id.* (quoting *Faish*, 72 F.3d at 307). A present inability to pay is not enough. Debtors must demonstrate that it is unlikely that they will ever be able to repay the loans. *See In re Ballard*, 60 B.R. 673, 675 (Bankr. W.D. Va. 1986).

  Robert is justifiably concerned that CSC will not obtain another contract, thus again leaving him unemployed. But Robert's apprehension that CSC will not obtain another government contract, and that he will be out of a job, is insufficient to establish that it will be impossible for him to repay the loans in the future. Under *Faish*, the Court cannot base its holding in this case on Robert's fears, for they are pure speculation. Although Robert has been unable to find a position that uses his training in electronic pre-press, he has an extensive job history in technical illustration. His expertise in military applications assisted him in obtaining his current position, and no evidence was

9

introduced to suggest that these skills no longer are in demand. Further, there are several events that may occur that would enable Debtors to increase their disposable income. Debtors' Honda Civic will be paid off in two years, which would provide additional disposable income. Debtors may insist that their children compensate Loraine for the care she provides to her grandchildren. Robert will be eligible to collect Social Security benefits in another year, and Loraine will be eligible in two years. Since Robert spends $385 per month on prescription drugs, he may be able to reduce this expense substantially when he becomes eligible for Medicare benefits in approximately one year.

Robert argued that he wanted to retire in order to care for Loraine. While Loraine's health may deteriorate, as with conjecture regarding Robert's future employment with CSC, it would be speculative for the Court to find that Loraine's state of health is an "additional circumstance that is likely to persist" for a significant portion of the repayment period. Debtor cites no cases in which a hardship discharge of a student loan has been granted because a debtor wanted to retire to care for an ailing spouse. When the health of the plaintiff is at issue, "courts have generally held that nondebilitating physical . . . conditions . . . do not impose an "undue hardship" where such conditions do not interfere with a debtor's ability to perform [his] job duties or present serious potential for a continued future drain on the debtor's financial resources." *In re McLeod,* 197 B.R. 624, 628 -629 (Bankr. N.D. Ohio 1996) (citing *Faish,* 72 F.3d at 300 )(finding that debtor failed to demonstrate undue hardship despite "significant" health problems arising from affliction with Crohn's disease where such condition did not interfere with her ability to perform her job); *In re Daugherty,* 175 B.R. 953, 959 (Bankr. E.D. Tenn. 1994) (finding absence of undue hardship where debtor's medical condition did not prevent her from performing job duties); *In re Coleman,* 98 B.R. 443, 453 (Bankr. S.D. Ind. 1989) (finding that debtor's non-debilitating high blood pressure did not impose an undue

hardship). No evidence was presented that Robert has serious health difficulties that inhibit him from continuing to work. Further, there is no legal authority to support the discharge of Robert's student loans because he wants to retire to care for his wife.

The only evidence regarding Debtors' health were representations by Robert that Loraine was in poor health and a listing of the medications taken by both Robert and Loraine. No expert medical testimony was provided regarding the health of either debtor. "Student loan debtors claiming undue hardship as a result of a medical condition must provide evidence to corroborate their claims." *In re Pobiner,* 309 B.R. 405, 419 (Bankr. E.D. N.Y. 2004) (citing *In re Pace*, 288 B.R. 788 (Bankr. S.D. Ohio 2003)) (lack of corroborating evidence of debtor's claimed health issues contributed to a finding of nondischargeability); *In re Bugos,* 288 B.R. 435 (Bankr. E.D. Va. 2003) (debtor's testimony regarding her symptoms and predicting whether they will substantially disable her for a substantial period of time was beyond her knowledge, background and expertise); *In re Swinney,* 266 B.R. 800 (Bankr. N.D. Ohio 2001) (medical claims in undue hardship cases require corroborating evidence, not mere allegations by the debtor). Although the list of prescriptions taken by Debtors was sufficient to establish that both Robert and Loraine have medical conditions that require treatment, there was no evidence of how these conditions affect Robert's ability to repay his student loans. The severity of their medical problems is questionable since neither Robert or Loraine have applied for Social Security disability. For these reasons, Robert has failed to convince the Court that his present inability to pay will persist in the future. Therefore, he has failed to satisfy the second prong of the *Brunner-Faish* test.

  c.  *Were good faith efforts made to repay?*

A debtor seeking to discharge a student loan on the grounds of undue hardship must

demonstrate that a good faith effort to repay the loan was made "over the entire time period between the date on which the first loan payment became due and the date on which the debtor filed bankruptcy." *Pelliccia v. US Department of Education*, 67 Fed. Appx. 88, 2003 WL 21024825 (3d Cir. No. 02-1998, May 2, 2003). Robert's student loans entered repayment status on May 2, 1997. Following a grace period, he received his first billing on November 3, 1997. He made payments of $195 per month at various times between December 1997 and April 2000 in a total amount of $1587.47. Therefore, during this 29-month period, Robert made approximately eight payments on the loans. Between May 2, 1997 and the date of the filing of the petition, Robert obtained more than 62 months in deferment and forbearance.

When inquiring whether a debtor has made a good faith effort to repay a student loan, a bankruptcy court must consider two factors: "(1) whether the debtor incurred substantial expenses beyond those required to pay for basic necessities and (2) whether the debtor made efforts to restructure his loan before filing his petition in bankruptcy." *Pelliccia*, 2003 WL 21024825, **3. As to the first factor, PHEAA did not present any evidence that Debtors incurred substantial expenses for items other than basic necessities. But as to the second factor, Robert admitted that he has not made any effort to restructure his student loans. If Robert had consolidated his loans through PHEAA, he would have had three repayment schedules from which to choose: 1) a "level" payment plan wherein his payments would be $105.51 per month for fifteen years; 2) an "extended payment plan wherein his payments would be $48.39 per month for two years and then $111.62 per month for thirteen years; and 3) a "graduated payment plan wherein his payments would be $48.39 for the first two years, $82.08 for the next three years, and $123.06 for the final ten years. In addition to restructuring through various consolidation plans, PHEAA also offers an "income-sensitive
12

repayment" option under which the amount of the repayment is calculated according to the income-to-loan ratio. Robert has not availed himself of any of these payment modification plans. Therefore, under the Third Circuit standard of good faith in regard to repayment efforts, Robert has failed to meet the requirements of the third prong of the *Brunner-Faish* test. *See In re Boykin*, 313 B.R. 516, 523 (M.D. Ga. 2004) ("failure to diligently pursue repayment options is a factor properly to be considered in applying *Brunner's* good faith requirement")

## **CONCLUSION**

In summary, Robert has failed to meet his burden under the second and third prongs of the *Brunner-Faish* test and, therefore, may not discharge his loans. This result may seem harsh considering the Debtors are in their sixties and without health insurance. But the standards for dischargeability of a student loan are stringent. Robert's disappointment in the failure of his education to provide him with expanded job opportunities is understandable, but the benefits of the training, or lack thereof, cannot be considered in the Court's analysis. As the Third Circuit observed in *Faish* – the government is not an insurer of "educational value." *Faish*, 72 F.3d at 306. The decision to borrow to advance ones' education is made by the individual and he, not the taxpayers, must bear the consequences of that decision. *Id.* Therefore, Debtors' complaint for a declaration of dischargeability will be denied. An appropriate order will be issued.

BY THE COURT,

*Mary D. France*
Bankruptcy Judge

Date: May 5, 2005

*This electronic opinion is signed and filed on the same date.*